[No. 24390. Department Two. September 12, 1933.]

*In the Matter of the Estate of* NELLIE GUNDERSON, *Deceased.*

HILDA ANDERSON MACKEY *et al., Respondents,* v. WILLIAM GOHL *et al., Appellants.*[1]

[1]Reported in 24 P. (2d) 1070.

*Gleeson & Gleeson* and *Nuzum & Nuzum,* for appellants.

*Roy C. Fox, Sidney H. Wentworth,* and *Orville W. Duell,* for respondents.

BLAKE, J.—To begin with, Nellie Gunderson died on December 14, 1931, leaving an estate subsequently appraised at approximately thirty-eight thousand dollars, more than half of which was in cash. The next day, William Gohl presented a petition to the superior court of Spokane county, representing that he was a creditor of the estate, and praying that letters issue appointing him special administrator. The presiding judge declined to appoint Gohl, but did appoint the Old National Bank & Union Trust Company. In passing, it is to be noted that appellant R. T. McBreen was present in court at the time Gohl presented his petition.

On December 17th, one C. H. Melson produced a will, which was presented for, and subsequently admitted to, probate. The will is as follows:

"Spokane, Wash., December 11th, 1931
"Friday afternoon 3:30 P. M.
"I Nellie Gunderson, being of sane mind and feeling that I am not going to live much longer do state that this is my free and voluntary act, and I wish that the following will be carried out as follows:

"I bequeath to R. T. McBreen, one house and lot in Spokane, Washington, located at E. 11 Lacrosse St.

"I bequeath to my sister Mrs. Bengta Janson, Hemmestro Bjorman, Sweden, Three Thousand Dollars ($3000.00).

"The balance of all of my real estate, farm lands, personal property, stocks, bonds, and mining shares, and trust shares, and personal effect, I bequeath to Wm. (Bill) Gohl, and R. T. McBreen to be divided equally.

"I am to receive all of my brother, Peter Gunderson's estate, consisting of stocks, cash, personal effect,

at his death. In case of my death my sister Mrs. Bengta Janson, is to get one half of Peter Gunderson's estate, and the balance goes to R. T. McBreen and Wm. (Bill) Gohl, and is to be divided equally.

"I wish to bequeath to Pete Bengston, and my niece the sum of Five Dollars each.

"In making this will it is my hope that it will not be necessary to probate and thus use up most of the property paying off lawyers' fees; and I hope that this will can be carried out as per my wishes.

"George P. Sandros          NELLIE GUNDERSON.
"Witness:
"C. H. Melson
"Witness:        "

Peter Bengtsson, who is a nephew of Nellie Gunderson, together with other nephews and nieces, filed a contest of the will, charging that the signature thereon was a forgery. The sole issue is the authenticity of the signature. The trial court found it to be a forgery, and entered judgment accordingly. From this judgment, Gohl and McBreen appeal.

Miss Gunderson for more than twenty years had operated the Lennox hotel, the patronage of which came largely from loggers and miners. She had no relatives in Spokane, nor in the state, at the time of her death. A brother, who had made his home at the hotel for some years, died in October preceding her death. Gohl, who was a butcher and cattle buyer, had made the hotel his home for more than twenty years. The three, Miss Gunderson, her brother, and Gohl, had maintained a common table, to which Gohl contributed one-half of the supplies.

Notwithstanding Miss Gunderson's business acumen, she had a weakness for mining stocks, and, apparently, she was on the "list" of many, if not most, of the curbstone brokers—and some others. Melson was a mining broker, with offices in the Mohawk building. Sandros,

the other witness to the will, was a salesman without an office. McBreen was in the same category.

Melson typed the will at his office. It is to be remembered the will, on its face, purports to have been executed on December 11th, at 3:30 P. M. Melson's testimony may be summarized as follows: Earlier that afternoon, he had been summoned by Miss Gunderson to the Lennox hotel for the purpose of advising her concerning an investment in mining stock offered by Sandros. When he arrived at the hotel, he found Sandros there. After some discussion of the value of the stock, Melson told Miss Gunderson that he wanted to make a further investigation before advising her.

Before he left, Miss Gunderson told him she wanted him to draw a will for her, and gave him directions as to the disposition she wished to make of her property. Melson then went to his office, where, on his own typewriter, he himself wrote the instrument above set out. He returned to the Lennox hotel within twenty or twenty-five minutes after he had left, and found Sandros still there. Miss Gunderson signed the will in the presence of himself and Sandros. They, at her request, then witnessed it.

Miss Gunderson asked him to keep the will for her until the next day, so he took it with him back to his office. The next day, which was Saturday, he went back to the Lennox with the will, intending to give it to her. There being someone with her, she told him to come back Monday morning. Sunday she was taken to the hospital. She died early Monday morning.

Sandros, who, by the way, had previously pleaded guilty to a charge of forgery, corroborated Melson's testimony relating to the execution of the will.

Melson learned of Miss Gunderson's death on Monday. He saw McBreen the morning of the seventeenth, and asked him who his attorney was. Upon being told,

he arranged to meet McBreen at the attorney's office that afternoon. Then McBreen, according to his testimony, first learned of the will.

There is a lack of candor manifested in the testimony of both Melson and McBreen concerning their conduct and the events which transpired between the time Miss Gunderson died and the production of the will at the attorney's office. Furthermore, we think that improbability is inherent in the stories of the making and execution of the will, as told by Melson and Sandros. But, aside from the suspicions as to the authenticity of the signature aroused by the evidence produced by the proponents themselves, we find in the record ample positive testimony that the signature is a forgery.

Three witnesses, Gust Nelson, Edwards and Williamson, produced by the contestants, testified that they were with Miss Gunderson during the afternoon of December 11th, and that neither Melson nor Sandros were there. Of course, counsel for proponents attack the credibility of these witnesses. It would extend this opinion unduly to set out the testimony of all of them in detail. We shall content ourselves with briefly summarizing the testimony of Gust Nelson, which is reinforced by reasonable circumstantialities, giving it a ring of truth which is carried even to the reader of the printed page.

Gust Nelson was a practical miner, who had lived at, or near, Kellogg, Idaho, for thirty years. He was familiar with the mines and prospects of the Coeur d'Alene district. Nellie Gunderson had known him for many years. He was in Spokane on the first and second of December, and while there met Miss Gunderson on the street. She told him she wanted to have a talk with him and find out what he knew about a certain property in the Coeur d'Alene district, in which she

was interested. He went back to Kellogg, and returned to Spokane on the eighth of December. On the ninth, he went to the Lennox to see Miss Gunderson. Their conversation was interrupted, and he left, with a promise to return at two o'clock on the eleventh. He did so return, and was with Miss Gunderson from two to four on the latter date. As above stated, he testified that neither Melson nor Sandros was there. He testified that both Williamson and Edwards were there also during the whole time he was.

It is contended, however, by counsel for proponents, that Nelson, on cross-examination, admitted that he was in Wenatchee on the eleventh. It is true, indeed, that he said he left Spokane on the evening of the tenth and returned the next evening. It is obvious, however, taking the entire context of his cross-examination, that he was referring to the evening of the ninth as the date of his departure for Wenatchee, and that he was so understood at the time. The fact that on the ninth he made an appointment with Miss Gunderson for the eleventh, instead of on the tenth, supports the view that his reference to the tenth as the date of his departure for Wenatchee was an inadvertence. An exactly parallel mistake was made by proponents' attorney in his testimony concerning the date on which he received the will from Melson. He testified that his receipt book showed that he received the will on the fifteenth. He afterward testified that he actually received it on the seventeenth.

Three experts in handwriting, testifying in behalf of the contestants, stamped the signature as a forgery; one, testifying in behalf of the proponents, said it was genuine. Their testimony was based upon a comparison of the signature on the will with some thirty concededly authentic signatures admitted in evidence. The experts for the contestants pointed out certain salient

characteristics that appear in practically all of the genuine signatures, and which are absent in the signature on the will. Some of these are apparent to the unexpert eye, and were admitted by the expert for the proponents. Be it said, however, that, notwithstanding he admitted the facts of difference, he stoutly adhered to his expressed opinion of the authenticity of the signature on the will. The trial court succinctly analyzed and compared the authentic signatures with that of the will in the following language:

"The first difference was the alignment or relation of the alleged forged signature to the base line. It is written a noticeable distance above the line, and 'Gunderson' has a gradual rise or slant upwards. It was characteristic of the deceased to follow the line and if there was any variation from a straight path it was downward so that the 'derson' would be divided by the line. . . .

"The most striking characteristics of Nellie Gunderson's signature are that she invariably lifted the pen at the 'n,' 'd' and 's.' Such lifts are entirely lacking in the purported signature. There is also a difference in those letters as to form, size and stroke: the 'e' does not compare with the usual 'e' and the 'r' and 'o' are entirely different in form. The testatrix invariably made her 'o' more like an 'a,' and there is always a down stroke before commencing the 'n.' The 'n' is plainly at variance with the characteristic 'n' and the writer made a serious mistake when he placed a period at the end."

We are satisfied that the evidence, by a clear preponderance, shows the signature on the purported will to be spurious.

We cannot close this opinion, however, without mentioning an assignment of error predicated on the rejection of proffered evidence. The proponents sought to show, by three witnesses, that two of the ex-

perts, called by the contestants, had been called in consultation as prospective expert witnesses in a criminal case pending sometime before in the Federal court at Spokane. The question there involved the authorship of certain anonymous letters which, it may be conceded, these two experts attributed to persons who did not write them. The offer of proof was properly rejected, as such evidence would have injected a collateral issue upon which a witness may not be contradicted. *State v. Carpenter,* 32 Wash. 254, 73 Pac. 357; *State v. Schuman,* 89 Wash. 9, 153 Pac. 1084, Ann. Cas. 1918A, 633. Conceding, however, that they voiced mistaken opinions in the other case, they may be, and we think they were, right in this. After all, the opinion of an expert, or of any other witness, can be persuasive only in the degree that it is supported by sound reason.

The judgment is affirmed.

BEALS, C. J., MAIN, STEINERT, and TOLMAN, JJ., concur.